United States District Court
Southern District of Texas
**ENTERED**
September 20, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| HEFEI ZIKING STEEL PIPE CO., LTD., § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. 4:20-CV-00425 |
| § | |
| MEEVER & MEEVER § | |
| and § | |
| MEEVER USA INC § | |
| and § | |
| RUSSELL MARINE, LLC, *et al*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM AND ORDER

### I.  INTRODUCTION

The plaintiff, Hefei Ziking Steel Pipe Co., Ltd. ("Ziking"), sued the defendants, Meever & Meever, Meever USA, Inc. (together, "Meever"),[1] and Russell Marine, LLC ("Russell Marine"), for damages arising out of Ziking's contract for the sale and shipment of steel products to Meever. The parties tried the case to the Court without a jury. After receiving documentary and testimonial evidence and the arguments of counsel, the Court enters this Memorandum and Order pursuant to Federal Rule of Civil Procedure 52(c).

### II.  BACKGROUND AND THE PARTIES' CONTENTIONS

This case arises from Meever USA's contracts to purchase customized steel pillars from Ziking, pillars which Meever contracted separately to sell to Russell Marine, the end-purchaser. Ziking alleges that Meever breached the Ziking-Meever contracts by refusing to pay for the shipped goods or to accept them after Ziking performed. Ziking also asserts that it detrimentally relied on Meever's and Russell Marine's subsequent representations that Russell Marine would

---

[1] The Court will refer to the Meever entities either individually or collectively, as necessary.

accept assignment of the contracts or otherwise buy the goods directly from Ziking. On these grounds, Ziking asserts claims against all the defendants for promissory estoppel, fraud, conspiracy, and aiding and abetting fraud. Alternatively, Ziking argues that Russell Marine entered into a binding contract to buy the steel pipe from Ziking in Meever's place.

Meever responds that Ziking's claims are barred by Ziking's prior material breach of the Ziking-Meever contracts, as well as an Indemnity and Hold Harmless Agreement ("IHHA") subsequently signed by Ziking's representative. Meever also counterclaims against Ziking, asserting that Ziking breached the IHHA by suing Meever and refusing to defend and indemnify Meever for its attorney's fees and costs in connection with Ziking's suit. Russell Marine denies that it made a binding promise to buy the steel pipe directly from Ziking, or that it entered into a contract to do so.

The Court held a bench trial of this matter from August 9th to August 12th, 2021.

### III. STANDARD OF REVIEW

Rule 52(c) of the Federal Rules of Civil Procedure provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). To this end, a court entering judgment pursuant to Rule 52(c) "must find the facts specially and state its conclusions of law separately" as denoted in Rule 52(a). *Id.*; Fed. R. Civ. P. 52(a)(1). Nevertheless, "Rule 52(a) does not require that the district court set out [its] findings on all factual questions that arise in a case." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1054 (5th Cir. 1997) (citing *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 433 (5th Cir. 1977)). Nor does it demand "punctilious detail [or] slavish tracing of the claims issue by issue and witness

by witness." *Century Marine Inc. v. U.S.*, 153 F.3d 225, 231 (5th Cir. 1998) (citing *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996) (internal quotations and citations omitted). Rather, a court's "[f]indings [are sufficient to] satisfy Rule 52 if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision." *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985) (internal citation omitted). "It is not necessary for the [d]istrict [c]ourt to go into minute details to state facts which are already admitted in the record. *Interfirst Bank of Abilene*, 778 F.2d at 234 (citing *Jackson v. Marine Expl. Co.*, 614 F.2d 65 (5th Cir. 1980)).

Moreover, "[u]nlike the standard applicable in judgments as a matter of law, when dismissing a case pursuant to Rule 52(c), a court is not required to make any special inferences or review the facts in the light most favorable to the plaintiff." *Weber v. Gainey's Concrete Prods., Inc.*, No. 97-31267, 1998 WL 699047, at *1 n.1 (5th Cir. Sept. 21, 1998) (citing *Sanders v. Gen. Servs. Admin.*, 707 F.2d 969, 971 (7th Cir. 1983)); *see also Ritchie v. U.S.*, 451 F.3d 1019, 1023 n.7 (9th Cir. 2006) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55, 110 S. Ct. 1331, 108 L. Ed.2d 504 (1990) ("The Supreme Court has held with respect to Rule 52(c)'s predecessor that the district court need not give the nonmoving party any favorable inferences.")). "A judgment on partial findings may be entered by the court 'at any time it can appropriately make a dispositive finding of fact on the evidence.'" *Weber*, 1998 WL 699047, at *1 n.1 (citing Fed. R. Civ. P. 52 advisory committee's note).

## IV.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

After the conclusion of the bench trial in this matter and after having carefully reviewed the parties' submissions, the record, the evidence admitted at trial and the applicable law, the

Court, pursuant to Fed. R. Civ. P. 52(c) and as permitted by Rule 52(a), sets forth its findings of fact and conclusions of law in this Memorandum and Order.

### A. ZIKING'S CLAIMS AGAINST MEEVER'S COUNTERCLAIMS

In its amended complaint, Ziking asserts the following claims against Meever: (a) breach of contract; (b) fraudulent inducement and misrepresentation; (c) promissory estoppel; (d) conspiracy; and (e) aiding and abetting fraud. Meever has counter-claimed for breach of the IHHA and seeks to recover attorney's fees incurred in defending against Ziking's suit. The Court makes the following findings of fact concerning the foregoing claims:

### i. Findings of Fact

1. Ziking is a global manufacturer and seller of line pipes and structural steel pipes and is based in the People's Republic of China. Meever & Meever is a company based in the Netherlands that produces, stocks, distributes, and rents steel material. Meever USA, Inc. ("Meever USA"), Meever & Meever's affiliate, operates, in relevant part, as a distributor of steel pipes in the United States.

2. Russell Marine is a heavy civil marine construction company located in Channelview, Texas. Russell Marine purchases materials for its construction projects through vendors/distributors, such as Meever USA.

3. On or about September 28, 2018, Meever USA entered into two valid and enforceable written contracts (the "Contracts") with Ziking, in which Meever USA agreed to purchase from Ziking custom-order, structural steel pillars for a total of $1,821,892.60. The Meever defendants intended to sell the custom steel pillars to Russell Marine in connection with two construction projects on which Russell Marine served as the general contractor.

4. Payment to Ziking under the Contracts was secured by two irrevocable letters of credit (the "LCs"), or payment guarantees, issued by Rabobank, Meever & Meever's bank located in the Netherlands. Meever & Meever was the applicant on both LCs.

5. No language existed in the Contracts or LCs allowing Meever USA to terminate the Contracts, reject delivery of, or refuse to pay, for the goods, should payment under the LCs fail. Instead, the LCs state that a fee of "EUR 50.00 OR EQUIVALENT WILL/SHALL BE DEDUCTED FROM THE PROCEEDS FOR EACH PRESENTATION OF DISCREPANT DOCUMENTS[.]"

6. The Contracts provided that the goods would be "Delivered CIF" to the Port of Houston and that "shipment" of the goods would be "as per LC." In amendments to the LCs, the parties ultimately extended the latest date of shipment to February 28, 2019, and the LCs' expiration dates to March 15, 2019.

7. On February 16, 2019, Ziking timely shipped the customized steel pillars to the Port of Houston. Prior to Ziking's shipment, a Meever representative inspected the steel pillars and issued a written "Certificate of Approval" confirming that the subject goods were in conformance and a written "Certificate of Acceptance of the Shipping Vessel."

8. Following shipment, Ziking submitted the shipping documents to its bank, the Industrial and Commercial Bank of China (ICBC). ICBC then timely forwarded them to Rabobank on February 27, 2019.

9. On March 4, 2019, while the steel pillars were en route to the Port of Houston, Rabobank informed Meever representative Marcel den Adel that the shipping documents received from Ziking did not conform to the LC terms in various respects. Specifically, Rabobank advised Meever that: the mill test certificate, which attests to the goods' chemical properties, did not

mention x-ray testing; the coating and x-ray test reports "did not show a correlation with the LC or other documents"; the documents did not state that the pipes were wrapped in rope; the insurance documents did not insure against consequential damages; and the shipping documents contained an incorrect HS (or tariff) code.

10. On March 7, 2019, den Adel replied to Rabobank that Meever would not accept the documents. The same day, Rabobank notified ICBC that it was refusing acceptance of the shipping documents, citing the document discrepancies. Consequently, Rabobank did not release the payments contemplated under the Contracts to ICBC. On March 10 (China time), ICBC notified Ziking of Rabobank's Advice of Refusal. That same day, Meever USA President Jeroen Koelewijn informed Shenwei Wang, Ziking's North American sales representative, via email correspondence: "We are not accepting the documents your company sent and we are unable to take delivery of the goods."

11. Ziking disputed that the documents were discrepant, but Meever issued its refusal before Ziking could take any action to cure the alleged document defects.

12. On or about March 10, Koelewijn called Wang and told him that Meever was having financial difficulties and that, for this reason, Rabobank would not make payment on the LC. Koelewijn asked Wang to fly to Houston immediately to attend an in-person meeting to resolve their issues. Meever's representatives met Wang in Houston early on Tuesday, March 12. That morning, Wang, Koelewijn, and Jan van Meever (the founder of Meever & Meever) drove to Russell Marine's office in Channelview, Texas for a joint meeting with Russell Marine ("the March 12 meeting").

13. At trial, Wang and Koelewijn disputed the reasons that Koelewijn and van Meever gave on the way to Russell Marine's office for withdrawing from the transaction. The parties agree,

however, that the purpose of the March 12 meeting was to try to come to an arrangement whereby Russell Marine would purchase the steel pillars directly from Ziking, as opposed to going through Meever.

14. Upon arrival at Russell Marine's office, Wang was introduced to two representatives of Russell Marine, Bob Andrews (Vice President and General Manager) and Joey Maldonado (Project Manager and Estimator). At the March 12 meeting, the Meever representatives expressed that they needed to withdraw from the transaction and proposed that Russell Marine purchase the steel pillars directly from Ziking. Andrews responded that there could be no discussion of any such arrangement, since Meever was still holding a $300,000 deposit from Russell Marine. The meeting ended shortly after Jan van Meever stated that he could return the deposit to Russell Marine from his personal account. Andrews left the meeting without agreeing to a direct sale arrangement with Ziking.

15. In an email sent to the Ziking corporate office after the March 12 meeting, Wang stated that he had an appointment with Meever the following morning "to sign a written agreement." Wang's superiors did not object to this course of action. Early morning on March 13, Koelewijn sent Wang an Indemnity and Hold Harmless Agreement between Ziking and Meever (the "IHHA"). That same morning, Koelewijn met with Wang in the lobby of Wang's hotel to discuss the document. Then Koelewijn, van Meever, and Wang drove together to the office of Meever's attorney, where the parties continued to discuss the IHHA. At some point prior to signing the document, Wang expressed to Koelewijn that Ziking wanted Meever to either assign the Contracts to Russell Marine or, alternatively, guarantee payment for the steel pillars as a part of

any final agreement. The IHHA did not include either of the provisions requested by Wang, but Wang signed the document at Meever's attorney's office on March 13.[2]

16. In an email to Koelewijn and Meever's attorney on March 24, Wang stated that he had learned he did not have authority to sign the IHHA. Koelewijn responded that the IHHA was valid and that there was nothing holding Ziking from entering into a new sale contract with Russell Marine.

17. Between March 12 and 27, Wang corresponded with Russell Marine's Bob Andrews frequently via email, proposing alternate vendors to import the steel pillars, as well as other ways to make the direct purchase viable for Russell Marine. However, on March 27, Andrews informed Wang in an email that Russell Marine would purchase steel pillars from a supplier other than Ziking. Russell Marine received its deposit back from Meever on March 22.

18. Upon arrival of the goods at the Port of Houston, Wang sought payment from Meever under the Contracts, but Meever declined, as did Russell Marine.

19. At trial, Wang testified that because Ziking could not off-load the goods in Houston without penalties, it had to forward the shipment to a port in Mexico, which cost approximately $130,000. Ziking also incurred $330,000 as the cost of shipping the goods back to China, as well as $75,000 in transportation costs within China. In May 2019, Ziking attempted to market and sell the steel pillars at a trade show in Houston, but it could not secure any buyers. Wang testified that, without an alternate buyer, Ziking will ultimately have to process the goods as scrap metal, which will cost approximately $250,000.

---

[2] Wang testified at trial that he was told he was signing the IHHA merely as a witness, not as a Ziking signatory or representative. Based on other testimony presented at trial regarding his language skills and discussion of the document with Meever representatives, the Court does not find Wang's testimony on this point to be credible.

20. On April 17, 2019, while the goods were in Mexico, Ziking's counsel made a written demand on Meever USA for $1,821,892.60 (the total amount of the Contracts), plus $50,182.43 in storage costs, interest, and attorney's fees. Meever USA refused payment, and Ziking subsequently filed this lawsuit.

### ii. Conclusions of Law

The Court makes the following conclusions of law, based on the evidence presented at trial:

####  a. Jurisdiction and Governing Law

1. The Court has two bases for subject matter jurisdiction: diversity jurisdiction under 28 U.S.C. § 1332 and federal question jurisdiction under 28 U.S.C. § 1331.

2. The Court has diversity jurisdiction because the parties here are completely diverse: Ziking is a citizen of China, Meever & Meever is a citizen of the Netherlands, Meever USA is a citizen of New York, and Russell Marine is a citizen of Texas. Further, the amount in controversy exceeds $75,000.

3. The Court has federal question jurisdiction because Ziking's and the Meever entities' respective countries of citizenship—China, the Netherlands, and the United States—are all signatories to the U.N. Convention on Contracts for the International Sale of Goods ("CISG").[3] *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 338 (5th Cir. 2003) ("As incorporated federal law, the CISG governs the dispute so long as the parties have not elected to exclude its application"). Because there is no evidence that Ziking and Meever selected any other law to govern disputes arising out of the Contracts, the CISG applies to the parties' claims.

---

[3] United Nations Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, 1489 U.N.T.S. 3, 19 I.L.M. 668 (1980).

        b.    <u>Ziking's Breach of Contract Claim</u>

4.    The Court begins with Ziking's breach of contract claim against the Meever entities. Ziking alleges that Meever breached the Contracts by refusing to pay for the shipped goods or to accept them after Ziking had performed. *See* CISG art. 34 (requiring the seller to "hand over documents relating to the goods" at "the time and place and in the form required by the contract").

5.    The parties do not dispute that the Contracts were valid and enforceable, or that Rabobank timely received the shipping documents. It is also undisputed that Meever instructed Rabobank not to issue payment for the steel pillars and then refused to accept the goods at the Port of Houston. Therefore, Ziking's claim turns on whether Meever USA avoids liability by establishing that Ziking committed a prior material (or, in CISG terms, "fundamental") breach of the Contracts by delivering discrepant shipping documents and by shipping non-conforming goods. CISG art. 64(1). Absent a prior fundamental breach by Ziking, Meever USA was required to "pay the price for the goods and take delivery of them[.]" *Id.* art. 53.

6.    Jeroen Koelewijn testified at trial that Meever & Meever instructed its bank, Rabobank, to issue an Advice of Refusal to Ziking's bank, ICBC, because the shipping documents contained discrepancies, when compared to the shipping terms set forth in the LCs.

7.    The Court is of the opinion that the document discrepancies alleged by Meever did not, together, constitute a fundamental breach of the Contracts by Ziking. The CISG defines a fundamental breach as one that "results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result." CISG art. 25. Meever asserts that the discrepancies violated the LCs'

Case 4:20-cv-00425   Document 106   Filed on 09/20/21 in TXSD   Page 11 of 20

shipping terms, which Meever asserts were incorporated into the Contracts. However, the LCs' provision that a fee of EUR 50.00 would be assessed "for each discrepant document" strongly suggests that the parties did not consider document discrepancies, themselves, to constitute a fundamental breach of the Contracts. Indeed, nowhere in the Contracts is it suggested that Meever USA's performance obligations would be excused if the shipping documents did not match the LC shipping terms. Accordingly, the discrepancies at issue did not discharge Meever USA from performing. *See* CISG art. 34 (providing that a buyer retains the right to claim damages for non-conforming documents).

8. Meever also alleges that Ziking breached the parties' contract by shipping non-conforming goods. Importantly, the Contracts provided that the goods would be "Delivered CIF" to the Port of Houston. The term "CIF" is one of numerous International Commercial Terms ("Incoterms"), which the CISG incorporates. *BP Oil*, 332 F.3d at 335. "[S]hipments designated 'CIF' require the seller to procure and pay for the costs of transporting and insuring the goods to the destination port but *transfer the risk of loss to the buyer once the goods 'pass the ship's rail' at the port of shipment*." *Id.* (emphasis added). Still, "the seller is liable . . . for any lack of conformity which exists at the time when the risk passes to the buyer, even though the lack of conformity becomes apparent only after that time." CISG art. 36(1). In other words, Ziking would be liable if it provided goods that "it knew or could not have been unaware" were defective when they "passed over the ship's rail" and shifted the risk to Meever USA. *BP Oil*, at 338 (quoting CISG art. 40).

9. Under the CISG, "[t]he buyer is allocated the burden of proving that the goods were defective prior to the expiration of the seller's obligation point." *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 408 F.3d 894, 898 (7th Cir. 2005). *See also Steuber Co. v. Hercules,*

*Inc.*, 646 F.2d 1093, 1096–1097 (5th Cir. Unit A July 1981) (construing the effect of "C.I.F." designations under the UCC).

10.  The Court is of the opinion that Meever waived its right to assert non-conformity of the goods by refusing to accept them at the Port of Houston, after it had already certified its approval. However, even if Meever had not waived its objection, Meever did not establish at trial that the steel pillars were non-conforming at the time they were shipped.

11.  Jeroen Koelewijn admitted at trial that when Meever refused delivery of the steel pillars on March 10, it could not have known whether independent testing had been performed on the goods. Koelewijn also testified that Meever signed off on the goods at the shipping port based on its own inspections, issued certificates of approval, and advised Ziking in an e-mail that there were no disputes and that Ziking could proceed to ship the goods.

12.  Meever alleges that, according to the testing reports included in the shipping documents, the steel pillars were not properly tested to ensure that they met the agreed-upon specifications. However, Rabobank's Advice of Refusal states only that the test reports "DO NOT SEEM TO HAVE A CORRELATION WITH THE L/C OR OTHER DOCUMENTS." This statement was not based on any actual inspection of the goods. Meever would have had to accept and inspect the steel pillars to determine whether the non-conformities suggested by Rabobank in fact existed and, subsequently, sue for damages. Because it refused to accept delivery of the goods, Meever could never make such a determination.

13.  Meever's sole evidence of non-conformity consists of lay witness testimony regarding a photograph of certain steel pillars taken in August 2019, after they had been shipped from Houston back to Ziking's facility in China. Meever offered no expert testimony concerning the conformity of the subject goods. While Andrews and Koelewijn gave lay testimony that the

August 2019 photo showed rust, Wang testified that the pillars in the photo showed only normal wear and tear. Meever also did not controvert Wang's testimony that the Contracts required coating of only the "top" of the steel pillars, and that the photo showed the uncoated sections. Based on the foregoing evidence, Meever did not carry its burden to show that "the goods were defective prior to the expiration of the seller's obligation point." *Chicago Prime Packers, Inc.*, 408 F.3d at 898. Thus, Meever did not establish that Ziking anticipatorily breached the Contracts.

      c. <u>The IHHA and Meever's Counter-Claim for Attorney's Fees</u>

  14. Meever asserts that the IHHA, which contains a release by Ziking of all claims against Meever relating to the Contracts, bars Ziking's contractual and other claims. Meever seeks attorney's fees for Ziking's breach of the IHHA. Meever responds that the IHHA is unenforceable because Wang did not have authority to bind Ziking to the IHHA or, alternatively, the IHHA lacks consideration.

  15. The parties agree that Texas law governs the issues of Wang's authority and whether the IHHA is a valid and enforceable contract.

  16. The Court concludes that, at minimum, Wang had apparent authority to bind Ziking to the IHHA. "To establish apparent authority, one must show that a principal either knowingly permitted an agent to hold himself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority." *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952–53 (Tex. 1996). Emails and testimony introduced at trial show that Ziking's corporate headquarters were aware that, at all times, Wang served as the company's point person with regard to the sale of the steel pillars to Meever USA. When, on March 12, 2019, Wang informed his superiors in an email that he had "made an appointment with [Meever] to sign a written agreement tomorrow morning[,]" they encouraged him to proceed and did not tell anyone at Meever that Wang lacked

13 / 20

authority to negotiate for Ziking. Accordingly, Wang had authority to enter into the IHHA on Ziking's behalf. *Walker Ins. Serv's. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 551–52 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

17.     The Court next turns to the question of consideration. Consideration consists of either a benefit to the promisor or a detriment to the promisee. *Northern Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex. 1998).

18.     Meever points to three provisions of the IHHA that it contends constitute consideration for Ziking's release of claims. The Court first addresses the paragraph in the IHHA's "Recitals" section stating that "[Meever USA] agrees further that it will not pursue any breach of contract or other action against [Ziking] for its contracting directly with . . . Russell Marine LLC of merchandise fulfilling these POs, Quotes and Invoices." It is true, as Meever points out, that under Texas law, the surrender of a legal right constitutes valid consideration to support a contract. *Id*. However, to the extent the Contracts implicitly barred Ziking from selling the steel pillars directly to Russell Marine, Meever waived any right to prevent such direct dealing when it informed Ziking on March 10 that it would not accept or pay for the steel pillars. *See Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (defining waiver as "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.").

19.     Meever also cites the IHHA provision stating: "All contracts and PO's between the Parties are hereby terminated without penalty or damages." The Court is of the opinion that Ziking was excused from all obligations under the Contracts, following Meever's material breach of non-payment and refusal to accept the goods. *BFI Waste Sys. of N. Am. v. N. Alamo Water Supply Corp.*, 251 S.W.3d 30, 30–31 (Tex. 2008) ("[W]hen one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."). Thus,

Meever's purported cancellation of the Contracts conferred no benefit to Ziking to which it was not already legally entitled.

20. Finally, Meever points to the following provision under the "Release and Indemnification" section (Section 2):

> In consideration of the foregoing, *and effective upon return of the Deposit to Russell Marine LLC*, [Ziking] . . . hereby RELEASES [Meever USA] . . . from all known and known claims . . . that related to arise out of the POs, Quotes, and Invoices, referenced above and canceled hereto[.]

(emphasis added). Meever contends that its return of the deposit to Russell Marine amounts to consideration. The Court disagrees for several reasons. First, the fact that the above language does not appear in the preceding section titled "Consideration and Performance" greatly undermines Meever's argument. Second, because Meever did not establish at trial that it had any legal right to retain Russell Marine's deposit, it did not incur a legal detriment by agreeing to return the deposit. Third, returning the deposit benefitted Russell Marine, not Ziking. Therefore, Meever's agreement to do so could not constitute consideration.

21. Because the IHHA lacks consideration from Meever, it is unenforceable and does not bar Ziking's breach of contract claim. Therefore, based on the foregoing analysis and discussion, Meever USA is liable to Ziking for breach of contract. Further, Meever's counter-claim for attorney's fees fails.

    d.    <u>Ziking's Damages</u>

22. Under the CISG, a prevailing plaintiff in a breach of contract suit may recover actual damages, as well as foreseeable consequential and incidental damages. CISG art. 74. Article 74 is "designed to place the aggrieved party in as good a position as if the other party had properly performed the contract[.]" *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1027 n. 1

(2d Cir. 1995). The Court finds that Ziking is entitled to actual damages in the amount of the Contracts, or $1,821,892.60.

23. With regard to Ziking's claimed incidental damages, the Court looks for guidance to the Texas UCC provisions.[4] Texas's Article 2 states that incidental damages "include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." Tex. Bus. & Com. Code § 2.710. Ziking presented uncontroverted evidence at trial that it incurred $130,000 in forwarding the goods to a Mexico port after Meever refused to accept them in Houston, $330,000 as the cost of shipping the goods back to China, and $75,000 in transportation costs within China. Accordingly, the Court finds that Ziking is entitled to $535,000 in consequential damages.[5]

24. Ziking also seeks to recover attorney's fees incurred in bringing this suit. Courts applying the CISG have treated demands for attorney's fees as governed by the law of forum state. *See, e.g., Zodiac Seats US LLC v. Synergy Aerospace Corp.*, No.: 4:17-cv-00410-ALM-KPJ, 2019 WL 1776960, at *5–6 (E.D. Tex. Apr. 23, 2019); *Granjas Aquanova S.A. de C.V. v. House Mfg. Co.*, No. 3:07–CV–00168–BSM, 2010 WL 4809342, at *2–3 (E.D. Ark. Nov. 19, 2010). Texas law permits a prevailing party in a breach of contract suit to recover attorney's fees and costs, provided the party, through its counsel, timely presents its claim to the opposing party pre-suit. Tex. Civ. Prac. & Rem. Code §§ 38.001–.002. Evidence adduced at trial showed that Ziking did

---

[4] In interpreting the CISG, courts may look to analogous UCC provisions. *Chicago Prime Packers, Inc.*, 408 F.3d at 898.

[5] Ziking also contended at trial that it was entitled to the cost of processing the goods as scrap. The Court finds that such costs are not reasonably foreseeable and declines to award them.

so on April 17, 2019. The Court, therefore, finds that Ziking is entitled to recover attorney's fees and costs. The Court will order Ziking to submit separate briefing in support of these amounts.

25. Ziking also seeks pre-judgment and post-judgment interest. The CISG entitles Plaintiff to pre-judgment interest. CISG art. 78.[6] The Court will award pre-judgment and post-judgment interest at the federal rate, pursuant to 28 U.S.C. § 1961.

### e. Ziking's Remaining Claims

Because the contract claim provides Ziking the greater recovery and because Ziking is entitled to a single recovery, the Court finds that Ziking's remaining claims against Meever USA should be dismissed. Additionally, because Meever & Meever was not a party to the Contracts, Ziking's claims against it are dismissed.

### B. ZIKING'S CLAIMS AGAINST RUSSELL MARINE

At the conclusion of Ziking's presentation of its evidence, and after it rested, Russell Marine moved, pursuant to FRCP 52(c), for judgment against Ziking, as a matter of law, on all Ziking's claims.

In its amended complaint, Zikings asserts the following claims against Russell Marine: (a) fraudulent inducement and misrepresentation; (b) promissory estoppel; (c) conspiracy; and (d) aiding and abetting fraud. The Court determines each of these claims is unmeritorious based on findings of fact made, heretofore, in the memorandum on the record and the following:

1. Russell Marine's statements that it was interested in completing the Ziking-Meever contracts by purchasing the shipment of the Steel Pillars under specific conditions and assurances, if made, did not constitute a "promise" to, in fact, purchase the shipment. Russell

---

[6] Federal law governs the allowance and rate of interest where, as here, a cause of action arises out of a federal law. *Carpenters Dist. Council of New Orleans & Vicinity v. Dillar Dep't Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994). The Court has discretion in choosing the pre-judgment rate of interest. *In re M/V Nicole Trahan*, 10 F.3d 1190, 1196 (5th Cir. 1994).

Marine's statements constitute nothing more than attempts to negotiate a purchase of the steel pipes that Meever was obligated to purchase.

2. There is no evidence that Russell Marine misled Ziking to forfeit its contract claim or any other claim(s) against Meever. There is no evidence that Meever and Russell Marine entered into or represented to Ziking that they were entering into an assignment of Meever's contractual obligations, whereby Russell Marine would be responsible to Ziking instead of Meever.

3. The evidence establishes that all parties engaged in discussions concerning the steel pillars that had been shipped. These discussions occurred over several days—March 10, 11, 12 and 13, 2019, and thereafter. The parties participating were seasoned businessmen fully capable of understanding, and did understand, the circumstances surrounding Meever's statement of rejection of its contract obligations with both Ziking and Russell Marine.

4. There is no evidence that Russell Marine engaged in any unlawful conspiratorial act(s) with Meever, or made any false representations concerning its intentions with regard to the purchase of the subject goods. There is no evidence that Ziking relied on any statements made by Russell Marine to its detriment or that, as a result of any statements made by Russell Marine, changed its position to its detriment.

5. There is no evidence that there was any consideration tendered between Russell Marine and Ziking, pursuant to any alleged promise or agreement. Moreover, there is no evidence that Ziking reasonably believed anything, based on any statements made by Russell Marine, that caused, or could have caused, Ziking to change its position regarding its contract with Meever to purchase the steel products at issue.

6. While some evidence (emails from Meever to Ziking) reveals that Meever represented to Ziking that Russell Marine would be willing to purchase the Steel Pillars, there is

no evidence that Russell Marine authorized Meever to make any such statements or knew, during the relevant period, that Meever made any such representation. Likewise, there is no evidence that Russell Marine was aware of any alleged false misrepresentations or conduct, on the part of Meever, that misled Ziking into believing that Russell Marine would purchase the steel products from Ziking and that it could release its interest in the contract or LCs between Ziking and Meever.

Based on the foregoing findings of fact, the Court concludes that:

1. Ziking and Russell Marine did not enter into a binding contract for the purchase of the steel pillars. The evidence at trial shows that the parties engaged in negotiations but never reached an agreement on the material terms of the transaction. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

2. Because Russell Marine made no promise or representation(s) that Ziking or any reasonable businessperson should have relied upon, there were no misleading representations or inducements made, and therefore no basis for reliance on the part of Ziking. Therefore, Ziking's claims for promissory estoppel and fraud fail. *Haase v. Glazner*, 62 S.W.3d 795, 797 (Tex. 2001); *Davis v. Texas Farm Bureau Ins.*, 470 S.W.3d 97, 108 (Tex. App—Houston [1st Dist.] 2015, no pet.); and

3. Because there is no evidence of an unlawful scheme by the acts of Russell Marine, there is no basis to believe that Russell Marine engaged in a conspiracy to injure Ziking or aided and abetted such a scheme.

Therefore, Russell Marine's Rule 52(c) motion for judgment as a matter of law should be, and is, hereby GRANTED.

## V.  CONCLUSION

Based on the foregoing analysis and discussion, the Court finds as follows:

1. The defendant, Meever USA Inc., is liable to the plaintiff, Hefei Ziking Steel Pipe Co., for breach of contract in the total amount of $2,356,892.60, plus reasonable attorney's fees, costs, and prejudgment interest;

2. Ziking's remaining claims against Meever USA Inc. and Meever & Meever are hereby dismissed;

3. Ziking's claims against the defendant, Russell Marine LLC, are hereby dismissed.

The Court ORDERS that:

4. Ziking shall, within 21 days, submit to the Court its application for attorney's fees incurred in prosecuting its breach of contract claim;

5. Meever USA Inc. shall have 21 days to respond to Ziking's application for attorney's fees.

It is so **ORDERED**.

SIGNED on this 20th day of September, 2021.

_____
Kenneth M. Hoyt
United States District Judge